IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.                                                          Criminal No. ELH-16-0117

EDWARD LEON SAMUEL, JR.
*Defendant*.

**MEMORANDUM OPINION**

This case concerns a motion for compassionate release filed by and on behalf of Edward
Samuel, Jr., defendant.[1]

Samuel entered a plea of guilty on January 9, 2017, to the offenses of possession with intent
to distribute 100 grams or more of mixtures containing heroin and cocaine, in violation of 21
U.S.C. § 841, and possession of a firearm in furtherance of a drug trafficking crime, in violation
of 18 U.S.C. § 924(c).  ECF 33; *see* ECF 34 ("Plea Agreement").  The plea was tendered pursuant
to Fed. R. Crim. P. 11(c)(1)(C) ("C Plea"), by which the parties agreed to a sentence ranging from
156 months to 192 months of imprisonment.  ECF 34, ¶ 9.  At the sentencing on March 16, 2017,
I imposed a term of 156 months of imprisonment, with credit for time served since February 2,
2016.  ECF 43.  In other words, I sentenced defendant to a term at the bottom of the C Plea range.

On October 20, 2022, Samuel filed a pro se "Motion for Compassionate Release or
Reduction of Sentence Pursuant to 18 USC 3582(C)(1)(A)(i)(D)" (ECF 72), supported by about
76 pages of exhibits.  ECF 72-1 to ECF 72-2.[2]  Then, on June 2, 2023, through the Office of the

---

[1] The parties refer to the defendant as "Edward Leon Samuel."  However, the record reflects
that the defendant's name is actually Edward Leon Samuel, Jr.

[2] On the same day defendant filed the Motion (ECF 72), he also filed a duplicate "Motion
for Compassionate Release or Reduction of Sentence Pursuant to 18 USC § 3582(C)(1)(A)(i)(D)."
ECF 70; ECF 70-1 to ECF 70-2.  ECF 72 includes as an exhibit a letter from Wesley Samuel,

Federal Public Defender ("FPD"), defendant filed a "Supplement to Motion for Compassionate Release to 18 U.S.C. § 3582(c)(1)(A)(i)" (ECF 75), supported by 131 pages of Samuel's prison medical records. ECF 75-1. I shall refer to ECF 72 and ECF 75 collectively as the "Motion." The government opposes the Motion. ECF 81; ECF 81-1 to ECF 81-2 (collectively, the "Opposition"). Defendant has replied. ECF 83 ("Reply").

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion in part and reduce defendant's sentence to 120 months of imprisonment.

## I.  Background

In a four-count indictment returned on March 24, 2016, a grand jury in the District of Maryland charged Samuel with the following offenses: possession with intent to distribute heroin and cocaine, in violation of 21 U.S.C. § 841 (Count 1); felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g) (Count 2); possession of a firearm with obliterated, removed or altered, in violation of 18 U.S.C. § 922(k) (Count 3); and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Count 4). ECF 1 ("Indictment").

Samuel pleaded guilty to Count 1 and Count 4 of the Indictment on January 9, 2017. ECF 33. As noted, pursuant to Fed. R. Crim. Pr. 11(c)(1)(C), the parties agreed to a total sentence in the range of 156 months to 192 months of imprisonment. ECF 34, ¶ 9. In particular, the parties agreed to a sentence of 96 to 132 months of imprisonment for Count 1 and the mandatory minimum sentence of 60 months, consecutive, for Count 4. *Id.*

___

defendant's son (ECF 72-1 at 75), that is not appended to ECF 70. Because ECF 72 appears to be a more complete presentation of defendant's motion, I shall regard ECF 72 as the operative pro se motion.

The Plea Agreement included a stipulation of facts. *Id.* at 9. According to the stipulation, Samuel distributed heroin and cocaine in Baltimore City. *Id.* A search of Samuel's home was conducted by law enforcement on February 2, 2016, pursuant to a search warrant. *Id.* Law enforcement recovered 171 grams of heroin and 25.8 grams of cocaine. *Id.* Defendant agreed that he "intended to distribute" the drugs to "his customers." *Id.* Law enforcement also recovered three loaded firearms. *Id.* Defendant admitted "that he possessed these firearms in furtherance of a drug trafficking crime." *Id.*

According to the Presentence Report (ECF 39, "PSR"), Samuel had a base offense level of 24 for Count 1. *Id.* ¶ 13. Moreover, defendant qualified as a Career Offender, pursuant to § 4B1.1 of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"). *Id.* ¶ 19. Because Samuel was designated as a Career Offender, he had a final offense level of 31 after deductions for acceptance of responsibility under U.S.S.G. § 3E1.1. *Id.* ¶¶ 21–22. And, as noted, under Count 4, Samuel was subject to a mandatory minimum term of imprisonment of five years, consecutive, pursuant to 18 U.S.C. § 924(c). *Id.* ¶ 24.

The PSR indicated that, in total, defendant had nine previous adult criminal convictions. *Id.* ¶¶ 27–35. Four of these convictions were for possession with intent to distribute heroin or cocaine. *Id.* ¶¶ 28, 32–33, 35. Defendant had also been convicted of conspiracy to possess with intent to distribute heroin, *id.* ¶ 30, and possession of heroin. *Id.* ¶ 31. Three of defendant's convictions involved firearms. *Id.* ¶¶ 29, 32, 34.

As a Career Offender, defendant's Criminal History Category was VI. *Id.* ¶ 38; *see* U.S.S.G. § 4B1.1(b). If Samuel were not a Career Offender, however, he would have had a Criminal History Category of III, based on a total score of six points. ECF 39, ¶ 37.

Based on an offense level of 31 and a Criminal History Category of VI, Samuel's Guidelines for Count 1 called for a period of incarceration ranging from 188 to 235 months. *Id.* ¶ 60. However, because the defendant qualified as a Career Offender and was also convicted of a violation of 18 U.S.C. § 924(c), the Guidelines range increased to 262 to 327 months of incarceration. *Id.*; *see* U.S.S.G. §§ 4B1.1(c)(3); 5G1.2(e).

If defendant were not a Career Offender, he would have had a final offense level of 21 for Count 1 and a criminal history category of III. In that circumstance, the Guidelines for Count 1 would have been 46 to 57 months of imprisonment. And, the Guidelines for the § 924(c) offense would correspond to the mandatory minimum of 60 months of imprisonment, consecutive to the sentence for Count 1. So, the total Guidelines range would have been 106 months to 117 months of imprisonment.

Notably, the longest sentence ever previously imposed on defendant was five years of imprisonment. *See* ECF 39, ¶ 32. However, because Maryland permits parole, defendant's longest period of incarceration was three years. *Id.*

Sentencing was held on March 16, 2017. ECF 41. At the time, the defendant was 50 years old. ECF 39 at 2. Pursuant to the Plea Agreement, I imposed a sentence of 96 months for Count 1, and a consecutive sentence of 60 months for Count 4, for a total term of 156 months of incarceration, with credit from the date of arrest on February 2, 2016. ECF 43. As noted, this sentence corresponded to the bottom of the C Plea range agreed to by the parties, *i.e.*, 156 to 192 months of imprisonment. ECF 34, ¶ 9.

On June 12, 2020, Samuel filed a pro se "Motion for Compassionate Release Due to COVID-19." ECF 48 ("First Motion"). Thereafter, through the FPD, defendant filed a "Memorandum in Support of Emergency Motion For Compassionate Release Pursuant to 18

U.S.C. § 3582(c)(1)(A)(i)."  ECF 53.  The government opposed the First Motion.  ECF 58.

Defendant replied.  ECF 61.

By Memorandum Opinion and Order of November 20, 2020, I denied the First Motion.

ECF 65; ECF 66.  In the Memorandum Opinion, I determined that Samuel's health conditions

provided an extraordinary and compelling reason for relief.  ECF 65 at 14–15.  However, I

concluded that, "[g]iven the facts of the offense . . . the defendant's prior criminal history and the

abbreviated time that defendant" had served, compassionate release was not warranted.  *Id.* at 16.

Samuel, who is now 56 years old, is currently incarcerated at the Federal Correctional

Institution, Fort Dix.  *See   Find   an   inmate*,   Federal   Bureau   of   Prisons,

https://www.bop.gov/inmateloc/ (last accessed December 7, 2023).  He has committed three

somewhat minor infractions while incarcerated: "smoking in an unauthorized area" and "disruptive

conduct," both related to his smoking a cigarette in a prison bathroom; and "being absent from

assignment," after "he overslept and missed" a medical appointment.  ECF 81-2.

With credit for time served since February 2, 2016, defendant has served about 94 months,

or 60 percent, of his sentence.  *See* ECF 43 at 2.[3]  His projected release date is April 11, 2027.  *See*

*Find an inmate*, *supra*, https://www.bop.gov/inmateloc/.

## II.    Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed."

18 U.S.C. § 3582(c); *see United States v. Brown*, 78 F.4th 122, 128 (4th Cir. 2023); *United States*

*v. Malone*, 57 F.4th 167, 173 (4th Cir. 2023); *United States v. Bond*, 56 F. 4th 381, 383 (4th Cir.

2023); *United States v. Bethea*, 54 F.4th 826, 831 (4th Cir. 2022); *United States v. Ferguson*, 55

---

[3] This does not account for good conduct credit.  Defendant asserts that, if an inmate is
eligible, the Bureau of Prisons applies "a standard rate of 85% for good time credit . . . ."  ECF 75
at 12 n.3.

F.4th 262, 267 (4th Cir. 2022); *United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020), *abrogated on other grounds by United States v. Troy*, 64 F.4th 177 (4th Cir. 2023); *United States v. Jackson*, 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  *See* 18 U.S.C. § 3582(c)(1)(B); *see also Jackson*, 952 F.3d at 495.

Section 3582 of Title 18 of the United States Code was first enacted as part of the Sentencing Reform Act of 1984.  As originally enacted, it permitted a court to alter a sentence only upon motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  This meant that a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See Bethea*, 54 F.4th at 831; *see, e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866–67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, compassionate release was an infrequent occurrence, because the BOP rarely filed such a motion on an inmate's behalf.  *See Hr'g on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).  However, as a result of the enactment of the First Step Act ("FSA") in December 2018, a federal inmate could file a motion for compassionate release directly with the court, so long as the inmate first exhausted administrative remedies.  *See* Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018) (codified as 18

6

U.S.C. § 3582(c)(1)(A)); *see also United States v. McCoy*, 981 F.3d 271, 275–76 (4th Cir. 2020).

With the passage of the 2018 FSA, Congress "broadened" the authority of courts to grant sentencing modifications. *Malone*, 57 F.4th at 173. Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) authorizes courts to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction." *Hargrove*, 30 F.4th at 194. This provision is an exception to the ordinary rule that a federal sentence is final. *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021). The FSA resulted in a sea change in the law.

In particular, the 2018 FSA authorized a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. 18 U.S.C. § 3582(c)(1)(A) (emphasis added). That is, once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, the defendant may petition a court directly for compassionate release. *Ferguson*, 55 F.4th at 268; *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.

Nonetheless, there are restrictions. Under 18 U.S.C. § 3582(c)(1)(A), the court may modify the defendant's sentence only if two criteria are met. *Brown*, 78 F.4th at 128; *Bethea*, 54 F.4th at 831. In other words, the analysis consists of "two steps." *Bond*, 56 F.4th at 383.

"First, the court must determine the prisoner is eligible for a sentence reduction because he has shown 'extraordinary and compelling reasons' supporting relief." *Bethea*, 54 F.4th at 831 (citation omitted); *see also Bond*, 56 F.4th at 383; *United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S. ___, 142 S. Ct. 383 (2021). If that criterion is met,

the court "must then find that release is appropriate under the 18 U.S.C. § 3553(a) sentencing factors, to the extent those factors are applicable." *Bethea*, 54 F.4th at 831; *see also Malone*, 57 F.4th at 174; *Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021); *Kibble*, 992 F.3d at 330.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169.   However, as the Fourth Circuit has recognized, "when deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).

The Policy Statement codified at U.S.S.G. § 1B1.13 is titled "Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A)" ("Policy Statement").   Critically, as discussed below, amendments to the Policy Statement took effect on November 1, 2023.   Prior to the amendments, however, the Policy Statement began: "Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . ." U.S.S.G. 1B1.13 (2021).   Interpreting this language in *McCoy*, 981 F.3d at 282, the Fourth Circuit stated that, "[b]y its plain terms . . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)."   Therefore, on the basis of that earlier text, the Court held: "When a defendant exercises his . . . right to move for compassionate release on his own behalf, § 1B1.13 does not apply, and thus § 3582(c)(1)(A)'s consistency requirement does not constrain the discretion of district courts." *McCoy*, 781 F.3d at 281.   As a result, district courts were "empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *Id.* at 284 (citation omitted); *see also Jenkins*, 22 F.4th at 170.

As indicated, the Fourth Circuit based its holding in *McCoy* and other cases on a version of the Policy Statement that has since been amended, effective November 1, 2023.  *See* Sentencing Guidelines for United States Courts, 88 Fed. Reg. 28254 (May 3, 2023) (providing notice of amendments to Congress).  In particular, as a result of the amendments that took effect on November 1, 2023, the Policy Statement now begins: "Upon motion of the Director of the Bureau of Prisons *or the defendant* pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . ."  U.S.S.G. § 1B1.13 (2023) (emphasis added).  Thus, the Sentencing Commission has made the Policy Statement expressly applicable to defendant-filed motions under § 3582(c)(1)(A).  *Cf. McCoy*, 981 F.3d at 282.

Therefore, it appears that the Fourth Circuit's conclusion in *McCoy*, 981 F.3d at 281, to the effect that "§ 1B1.13 is not an 'applicable' policy statement," is no longer consistent with the Guidelines, as amended.  This is because the Policy Statement is now expressly applicable to defendant-filed motions pursuant to 18 U.S.C. § 3582(c)(1)(A).[4]

A court must ensure that any sentence reduction "is consistent with" the Policy Statement's provisions.  18 U.S.C. § 3582(c)(1)(A).  The Policy Statement provides, in part, U.S.S.G. § 1B1.13(a):

> (B) IN GENERAL.—Upon motion of the Director of the Bureau of Prisons or the defendant pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—

---

[4] Defendant's Motion was filed on October 20, 2022, before the amendments to U.S.S.G. § 1B1.13 took effect.  But, the Court applies the law in effect at the time of its decision, not the law in effect at the time the Motion was filed.  *Cf. Maryland Shall Issue, Inc. v. Governor Wes Moore*, ___ F.4th ___, 2023 WL 8043827 (4th Cir. Nov. 21, 2023) (ruling in accordance with law in effect at the time of the appellate decision, not the law in effect at the time of the district court's decision).  In any event, the Court would reach the same outcome under the law in effect before the amendments of November 1, 2023.

(1) (A) extraordinary and compelling reasons warrant the reduction; or

(B) the defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;

(2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

(3) the reduction is consistent with this policy statement.

The Policy Statement identifies six circumstances that, individually or in combination, may provide "extraordinary and compelling reasons" for a reduction in sentence. *Id.* § 1B1.13(b)(1)– (6). These are: certain medical circumstances of the defendant, such as terminal illness or the inability to receive specialized medical care while incarcerated, *id.* § 1B1.13(b)(1); the defendant's age, *id.* § 1B1.13(b)(2); the defendant's family circumstances, *id.* § 1B1.13(b)(3); the fact that the defendant, while in custody, was the victim of sexual or physical abuse committed by, or at the direction, of a correctional officer, *id.* § 1B1.13(b)(4); the defendant received an "unusually long sentence," *id.* § 1B1.13(b)(6); and "any other circumstances or combination of circumstances . . . similar in gravity to" the circumstances "described in paragraphs (1) through (4)." *Id.* § 1B1.13(b)(5).

Prior to the amendments, the district court was obligated to consider all non-frivolous arguments for sentence reduction based on intervening changes in the law and factual developments. *Concepcion v. United States*, ___ U.S. ___, 142 S. Ct. 2389, 2396 (2022); *Troy*, 64 F.4th at 184; *United States v. Reed*, 58 F.4th 816, 822 (4th Cir. 2023); *United States v. Brice*, 2022 WL 3715086, at *2 (4th Cir. Aug. 29, 2022) (per curiam). Where appropriate, the district court had to "account not only for the circumstances at the time of the original offense but also for significant post-sentencing developments." *United States v. Mangarella*, 57 F.4th 197, 203 (4th

10

Cir. 2023); *see Martin*, 916 F.3d at 397; *Kibble*, 992 F.3d at 334 n.3.  However, such developments did not warrant a recalculation of the Guidelines.  *Troy*, 64 F.4th at 184.

Notably, § 1B1.13(c) of the Policy Statement now specifies that, "[e]xcept as provided in subsection (b)(6)," which concerns an "unusually long sentence," "a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) shall not be considered for purposes of determining whether an extraordinary and compelling reason exists under this policy statement."  However, "if a defendant otherwise establishes that extraordinary and compelling reasons warrant a sentence reduction under [the Policy Statement], a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) may be considered for purposes of determining the extent of any such reduction."  *Id.*

Section 1B1.13(d) of the Policy Statement, which limits the weight a court may assign to a defendant's rehabilitation while serving a sentence, is also relevant.  It provides that, "[p]ursuant to 28 U.S.C. §994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement."  *Id.*  "However, rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted."  *Id.*

Even if a defendant establishes that extraordinary and compelling reasons warrant relief, the court must also consider the sentencing factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.  *See Dillon v. United States*, 560 U.S. 817, 826–27 (2010); *Brown*, 78 F.4th at 128; *Mangarella*, 57 F.4th at 200, 203; *Malone*, 57 F.4th at 174; *Bethea*, 54 F.4th at 833; *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *Martin*, 916 F.3d at 397; *see also United States v. Jones*, 2022 WL 2303960, at \*1 (4th Cir. June 27, 2022)

(per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329–30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d at 693–94 (district court must give due consideration to the § 3553(a) factors).  Notably, the recent amendments to the Guidelines did not alter this requirement.

The "factors include 'the nature and circumstances of the offense'; 'the history and characteristics of the defendant'; and the need for the sentence to 'provide just punishment,' 'afford adequate deterrence,' 'protect the public from further crimes of the defendant,' and 'provide the defendant with . . . training, medical care, or other correctional treatment.'" *Jenkins*, 22 F.4th at 170 (quoting 18 U.S.C. § 3553(a)).  As the Fourth Circuit has observed, "'many case-specific facts fit under the broad umbrella of the Section 3553(a) factors.'"  *Bond*, 56 F.4th at 384 (quoting *Jackson*, 952 at 500).  And, in weighing the § 3553(a) factors, the court may consider the terms of a plea bargain.  *Bond*, 56 F.4th at 384–85.

"A district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release."  *Jenkins*, 22 F.4th at 170; *see Chavez-Meza v. United States*, ___ U.S.

12

___, 138 S. Ct. 1959 (2018); *High*, 997 F.3d at 187.  But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law."  *High*, 997 F.3d at 187 (internal quotation marks omitted); *see Jenkins*, 22 F.4th at 167; *see also Brown*, 78 F.4th at 132 (criticizing district judge's "cursory" consideration of the § 3553(a) factors); *United States v. Dillard*, 891 F.3d 151, 158 (4th Cir. 2018).  And, "'the record as a whole'" must demonstrate that the judge considered the parties' contentions and had "'a reasoned basis'" for the exercise of judicial discretion.  *Malone*, 57 F.4th at 176 (citations omitted); *see also United States v. Puzey*, 2023 WL 2985127, at *2 (4th Cir. Apr. 18, 2023) (per curiam).

That said, "[h]ow much explanation is 'enough' depends on the complexity of a given case."  *Gutierrez*, 2023 WL 245001, at *3; *see United States v. McDonald*, 986 F.3d 402, 412 (4th Cir. 2021).  For example, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'"  *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*).  In providing such an explanation, "a district court is permitted to add to its original, sentencing-phase consideration of the § 3553(a) factors when explaining its compassionate release ruling."  *Bethea*, 54 F.4th at 834; *see Kibble*, 992 F.3d at 332.  In any event, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case."  *Cohen*, 2022 WL 2314300, at *1 (quoting *High*, 997 F.3d at 190).

13

### III.  COVID-19

### A.

Health officials confirmed the first case of COVID-19 in the United States on January 31, 2020.[5]  *United States v. Pair*, 84 F. 4th 577, 580 (4th Cir. 2023) (citation omitted).  Then, on March 11, 2020, the World Health Organization declared COVID-19 a global pandemic.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[6]  Two days later, on March 13, 2020, President Trump declared a national emergency concerning the COVID-19 pandemic. *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19)*, TRUMP WHITE HOUSE (Mar. 13, 2020), https://perma.cc/WF55-8M4P.   That declaration was extended on several occasions.  *See*, *e.g.*, 88 Fed. Reg. 9385 (Feb. 10, 2023).

The pandemic spawned "a public health crisis more severe than any seen for a hundred years."  *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam). Indeed, for a significant period, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it."  *Cameron v. Bouchard*, 462 F. Supp. 3d 746, 752–53 (E.D. Mich. 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020).  Schools and businesses were closed, or operated on a limited basis, in an effort to thwart the spread of the virus, which is extremely contagious.  *Pair*, 84 F.4th at 589; *see Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (August 11, 2022), https://perma.cc/QGL2-3URS.  As the Fourth Circuit has put it,

---

[5] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[6] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://perma.cc/24J3-UQZN.

in the early months of 2020, "a new reality set in.  Nations around the world announced stringent limitations on in-person interaction . . . businesses ground to a halt; and death tolls mounted." *Pair*, 84 F.4th at 580.

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.*  Nevertheless, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020), *abrogation on other grounds recognized by United States v. Phillibert*, 557 F. Supp. 3d 456 (S.D.N.Y. 2021) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").

People infected with the coronavirus sometimes experience only mild or moderate symptoms.  But, particularly at the outset of the pandemic, the virus caused severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).  On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first cases upended everyday life."  Trevor Hunnicutt & Jeff Mason, *Biden Marks One Million U.S. COVID Deaths After Losing Political Battles*, Reuters (May 12, 2022), https://perma.cc/TLA5-YNFB.  And, as of March 10, 2023—the last day on which Johns Hopkins University updated its COVID-19 data—more than 103.8 million Americans had been infected with COVID-19.  *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://perma.cc/J7XS-FYHT.

The Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus, and has repeatedly revised its guidance concerning medical conditions that pose a greater risk of severe illness due to COVID-19.  The CDC most recently updated its guidance in May 2023 to reflect the most current data. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 11, 2023), https://perma.cc/923J-T5P8.

According to the CDC, the factors that increase the risk of severe illness include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities such as Down syndrome; heart conditions such as heart failure, coronary artery disease, cardiomyopathies, and possibly hypertension; HIV; being immunocompromised; liver disease; having a BMI 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis.  *People with Certain Medical Conditions*, *supra*, https://perma.cc/923J-T5P8.

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.  *See COVID-19 Risks and Information for Older Adults*, CTRS. FOR DISEASE CONTROL & PREVENTION (Feb. 22, 2023), https://perma.cc/VG23-TQMM. Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person."  *People with Certain Medical Conditions*, *supra*, https://perma.cc/923J-T5P8.

**B.**

As noted, the coronavirus is "highly contagious." *Pair*, 84 F.4th at 589.  At the outset of the pandemic, some of the "measures we now know to be useful in combating the spread of the virus (such as masking, separation . . . and vaccinations) were either nascent or, as in the case of vaccines, unavailable." *Id.*  Nevertheless, in an effort to prevent the spread of COVID-19, the CDC urged, *inter alia*, the practice of "social distancing." *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CENTERS FOR DISEASE CONTROL & PREVENTION (Jan. 26, 2023), https://perma.cc/UJ98-2V6S; *see also Pair*, 84 F.4th at 585.

However, social distancing and "rigorous personal hygiene," which are "important combatants to the virus," are particularly difficult in the penal setting.  *Seth*, 461 F. Supp. 3d at 248.  Indeed, prisoners have little ability to protect themselves from the threat posed by the coronavirus.  *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.  Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020), https://perma.cc/3RHL-WNKU.  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We Do Not Feel Safe,'* WASH. POST (Aug. 24, 2020),

https://perma.cc/K6SW-LFGX (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep.  Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to limit their spread.  *See Coreas v. Bounds*, TDC-20-0780, 451 F. Supp. 3d 407, 413 (D. Md. 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021), https://perma.cc/TR7Q-8H9J ("The cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease.  Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519–20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, "in recognition of [the] stark reality" that COVID-19 posed substantial challenges to incarcerated individuals, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus.  *Seth*, 461 F. Supp. 3d at 248.  Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected.  As the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's spread."

Thereafter, on March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the increased use of home confinement. The memorandum provided that the BOP should prioritize for review for home confinement eligibility those inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

## C.

There is no cure for the coronavirus. But, medical therapies have continued to improve, and vaccines are now generally available. *See Stay Up to Date with COVID-19 Vaccines*, CENTERS FOR DISEASE CONTROL & PREVENTION (Oct. 4, 2023), https://perma.cc/VZ77-KN7W. Although the vaccines do not appear to prevent illness, they do seem to reduce the seriousness of the illness.

On January 4, 2021, at about the time the first vaccines became available, the BOP published "COVID-19 Vaccine Guidance." *See COVID-19 Vaccine Guidance*, FEDERAL BUREAU OF PRISONS CLINICAL GUIDANCE (Jan. 4, 2021), https://perma.cc/P4KL-PEZW. It provided that administration of the COVID-19 vaccines (Pfizer and Moderna) would "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6. The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://perma.cc/2FF2-G6PX.

Much has changed since the coronavirus first emerged in early 2020. And, the virus, too, has changed repeatedly, with multiple strains and variants. As of May 11, 2023—the last day on which the CDC updated its vaccine tracker—approximately 69% of the total U.S. population had completed their primary vaccination series (i.e., one dose of a single-dose vaccine or two doses on different days), including 32% of people from ages 5 to 11, 61% of people from ages 12 to 17, 66% of people from ages 18 to 24, 72% of people from ages 25 to 49, 83% of people from ages 50 to 54, and 94% of people ages 65 and up. *See COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL, https://perma.cc/B2KG-M4E3 (final update May 11, 2023); *Trends in Demographic Characteristics of People Receiving COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL, https://perma.cc/6W5Q-55DR (final update May 11, 2023).

### D.

In an interview in September 2022 on the CBS television show "60 Minutes", President Biden declared that the pandemic was "over" in the United States. Alexander Tin, *Biden Says Covid-19 Pandemic is "Over" in U.S.*, CBS NEWS (Sept. 19, 2022). He stated: "The pandemic is

over.  We still have a problem with COVID.  We're still doing a lotta work on it . . . .  But the pandemic is over."  *Id.*  And, on April 10, 2023, President Biden signed into law House Joint Resolution 7, "which terminate[d] the national emergency related to the COVID-19 pandemic." Pub. L. No. 118-3, 137 Stat. 6 (2023).

Nevertheless, at the time of this writing, data suggests that COVID-19 remains prevalent. *See COVID Data Tracker*, C_NTRS. F_OR D_ISEASE C_ONTROL & P_REVENTION, https://covid.cdc.gov/covid-data-tracker/#datatracker-home  (last updated Dec. 4, 2023). Moreover, available data may not provide a full picture of COVID-19's spread, because "[s]ince the end of the public health emergency on May 11, 2023, data that has been crucial to understanding the spread and impact of Covid is reported by government sources less frequently, or is no longer reported at all."  *Track Covid-19 in the U.S.*, T_HE N_EW Y_ORK T_IMES, https://www.nytimes.com/interactive/2023/us/covid-cases.html (last updated Dec. 4, 2023).

## IV.  Discussion

### A.

Samuel argues that his medical conditions, which include chronic kidney disease, type two diabetes, hypertension, and dependence on a wheelchair, provide an extraordinary and compelling reason for compassionate release.  ECF 75 at 8–9.  Defendant asserts that, as "long as the pandemic continues," these "chronic conditions, on their own," are sufficient to justify relief.  *Id.* at 8. Indeed, as defendant observes, *id.* at 9, this Court previously concluded in its Memorandum Opinion of November 20, 2020 (ECF 65), that defendant's "serious chronic medical conditions, including diabetes and hypertension . . . qualif[ied] as a compelling reason for compassionate release."  *Id.* at 14.  And, at the time, defendant was not confined to a wheelchair.  *See* ECF 75 at 5.

Defendant maintains that "his declining health and inability to timely access medical care" have made his need for compassionate release even more urgent than at the time the Court considered defendant's First Motion. *Id.* at 9. He explains that in January 2022, he became severely ill with COVID-19 and spent 34 days in the hospital receiving treatment for "acute respiratory failure, hypoxemia, and pneumonia." *Id.* According to defendant, even after his discharge from the hospital, he has continued to "experienc[e] numerous symptoms of long Covid, including shortness of breath, fatigue, and pain in his leg muscles and joints." *Id.* The defense asserts: "These symptoms have kept [defendant] from walking again, and he now relies on a wheelchair to get around." *Id.*

Defendant has submitted a sworn Declaration that describes his illness with COVID-19 and his persistent post-infection symptoms. ECF 72-1 at 7–11. He avers, *id.* at 8, ¶¶ 2, 4:

> On January 1, 2022 I began experiencing symptoms consistent with COVID-19. These symptoms include[d] dizziness, shortness of breath, body aches and fever. I could not eat and was so fatigued I just stayed in my assigned bunk on the third floor of housing unit 5811. . . . My symptoms continued for the next 13-days. On January 13, 2022 at approximately 9:30pm I attempted to rise out of my bunk . . . . As I stood-up I lost consciousness and collapsed, injuring my head and knee in the fall.

In addition, defendant states, *id.* at 10, ¶ 15: "Due to my illness, I lost the ability to walk, have encephalit[i]s, swelling on my brain and numerous other long COVID-19 symptoms. Though the hospital admitted me to physical therapy, which was painful, I never regained the use of my legs and am now confined to a wheelchair."

I discuss defendant's medical conditions in more detail, *infra*.

Defendant also suggests that his health problems have been exacerbated by inadequate medical care at FCI Fort Dix. *Id.* In particular, he claims: "More than ten months have passed since a Neurologist recommended that [defendant] undergo a brain MRA [magnetic resonance

angiography] and MRI [magnetic resonance imaging], yet those procedures have not been scheduled." *Id.* In defendant's view, his medical records "paint a portrait of a 5[6]-year-old man whose health and quality of life have been steadily declining for several years, and whose distress regarding his medical outlook is amply justified by the lack of follow-up care he has received while incarcerated at Fort Dix." *Id.* at 9–10.

Samuel also argues that the sentencing factors under 18 U.S.C. § 3553(a) favor relief. *Id.* at 10–13. According to defendant, the sentence he has served to date should be considered adequate punishment, because "the punishing conditions of confinement" associated with the pandemic, in combination with his deteriorating health, have significantly diminished his quality of life. *Id.* at 11. In particular, defendant states that, in the seventeen months preceding the filing of the Motion, "he has not been able to walk at all, and thus [could not] readily participate in programming and work assignments to feel productive and stave off worry and despair about his health and future." *Id.*

In addition, defendant argues that "his declining health" and the deterrent effect of "[t]he difficult circumstances of [his] sentence" reduce his likelihood of recidivism. *Id.* According to defendant, upon release his "focus will be on his health and his family, especially his children and grandchildren." *Id.* Defendant asserts that "[h]e is not likely to break the law and risk reincarceration, restricted access to medical care, and separation from his loved ones, ever again." *Id.*

Further, defendant suggests that a sentence reduction would be appropriate because, assuming good time credit, the sentence defendant has served exceeds "the low-end of the guidelines range that would have applied in his case had he not qualified as a career offender," *id.* at 12, namely, 106 to 117 months of imprisonment. *Id.* at 12 n.7. In defendant's view, "[t]his is

significant," because he "is not the sort of defendant that the drafters of the career offender guideline had in mind." *Id.* at 12. In particular, according to defendant, "Congress meant to target kingpins and major traffickers," not "street-level dealer[s]" like him. *Id.*

Several of defendant's children have submitted letters to the Court in support of defendant's Motion. *See* ECF 71-2 at 69 (letter from Kokiea Samuel, defendant's daughter), *id.* at 71 (letter from Breah Samuel, defendant's daughter), *id.* at 75 (letter from Wesley Samuel, defendant's son). These letters attest to defendant's love for his grandchildren, *id.* at 69, 71, and express concern for defendant's health. *Id.* at 69, 71, 75.

Finally, defendant maintains that he has satisfactorily pursued administrative remedies as required under 18 U.S.C. § 3582(c)(1)(A), by submitting "an institutional petition" for compassionate release "to the warden of FCI Fort Dix" on August 25, 2022. ECF 75 at 2; *see* ECF 72-1 at 2.

In its Opposition, the government concedes that defendant has met the exhaustion requirement under 18 U.S.C. § 3582(c)(1)(A). ECF 81 at 4. Nonetheless, the government argues, first, that Samuel's "refusal to become vaccinated [against COVID-19] should make it prohibitively difficult for him to prevail." *Id.* at 12.

The government acknowledges that, in its Memorandum Opinion of November 20, 2020, the "Court held that some of the Defendant's medical conditions did qualify as an extraordinary and compelling reason for release." *Id.* at 11. Nonetheless, according to the government, "circumstances have dramatically improved since the Defendant last" moved for compassionate release, largely as a result of the vaccine, which defendant has refused to receive. *Id.* In the government's view, defendant's "repeated refusals to take the most basic yet effective step to

protect himself severely undermine any claim that COVID-19 presents an extraordinary or compelling reason for relief." *Id.* at 12.

Second, the government argues that the sentencing factors under 18 U.S.C. § 3553(a) weigh against granting compassionate release. *Id.* at 15–16. In its view, "[t]he nature and circumstances of the offense are serious," because defendant "possessed several loaded firearms along with distributable quantities of heroin and cocaine that he intended to sell." *Id.* at 15. Moreover, the government states, *id.*: "Although the Defendant's criminal history is decades old, it does not support his release." According to the government, it is significant that, "[e]ven after approximately seven years of . . . no arrests" since his "last release from state prison in April 2009," Samuel "was again arrested in February 2016, for the same dangerous conduct—drug distribution (heroin and cocaine) and firearms possession." *Id.*

Third, the government maintains that, notwithstanding Samuel's suggestion that Career Offender status should be reserved for "kingpins," defendant should be held to the sentencing range to which he agreed in the Plea Agreement, namely, 156 months to 192 months of imprisonment. *Id.* at 16; *see* ECF 34, ¶ 9. According to the government, "[t]o dispute these guidelines now suggests a deflection of full responsibility, and a less than adequate respect for the deterrence the Defendant's sentence was meant to provide." ECF 81 at 16.

Finally, the government argues that defendant's "family support," as reflected in the letters submitted by his children, "should not overshadow the seriousness and disturbing pattern of the Defendant's instant offenses and prior criminal conduct." *Id.*

In his Reply, Samuel asserts that "[t]he government misconstrues the basis of [his] motion" by "erroneously claiming that he seeks compassionate release to mitigate his risk of contracting Covid-19." ECF 83 at 1. "In doing so," defendant argues, "the government fails to refute the

'extraordinary and compelling' circumstances that [defendant] has indeed advanced," namely, "his deteriorating health and FCI Fort Dix's failure to provide him with timely medical care." *Id.* According to defendant, because his "request for compassionate release is not based upon his vulnerability to Covid-19, his refusal of the Covid-19 vaccine has no bearing" on his entitlement to relief. *Id.* at 2.

In the Reply, Samuel also renews his argument that the sentencing factors under 18 U.S.C. § 3553(a) favor relief. In particular, Samuel observes that, as of July 18, 2023, he "ha[d] been in custody for 89 months—a term that . . . exceeds his longest prior period of incarceration by 4 years . . . ." *Id.* at 2. Moreover, according to Samuel, his time in prison "has been characterized by calamity," ECF 83 at 2, because his mother and two aunts have died, ECF 75 at 11, and he has experienced "a progressive decline in [his] health and quality of life." ECF 83 at 2.

Finally, Samuel states that his "request for compassionate release and § 3553(a) arguments should not be construed as a retraction of his acceptance of responsibility." ECF 83 at 3. In particular, defendant asserts that he "has not argued that the career offender guideline was improperly applied to him as a matter of law." *Id.* Instead, "[h]e has simply asked the Court to consider Congress' intent in drafting the guideline, along with the guidelines range that would apply but for the application" of the Career Offender enhancement. *Id.*

**B.**

As indicated, effective November 1, 2023, § 1B1.13(b)(1) of the Policy Statement identifies four circumstances under which a defendant's medical condition may provide an extraordinary and compelling reason for relief. *See* U.S.S.G. § 1B1.13(b)(1)(A)–(D). First, under § 1B1.13(b)(1)(A), "a terminal illness (*i.e.,* a serious and advanced illness with an end-of-life trajectory)," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-

stage organ disease, and advanced dementia," may provide an extraordinary and compelling reason for relief.  Second, under § 1B1.13(b)(1)(B), an extraordinary or compelling reason may exist if the defendant is "suffering from a serious physical or medical condition," "suffering from a serious functional or cognitive impairment," or "experiencing deteriorating physical or mental health because of . . . aging," and such condition or impairment "substantially diminishes" the defendant's ability to care for himself.  Third, under § 1B1.13(b)(1)(C), an extraordinary or compelling reason may exist if "[t]he defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death."

Finally, under § 1B1.13(b)(1)(D), relief may be warranted if:

(i)     the defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority;

(ii)    due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency described in clause (i); and

(iii)   such risk cannot be adequately mitigated in a timely manner.

In my view, both § 1B1.13(b)(1)(B) and § 1B1.13(b)(1)(C) of the Policy Statement provide an independent basis for relief.

Defendant's medical records provide ample evidence that he is "suffering from a serious physical or medical condition" or "a serious functional . . . impairment" that "substantially diminishes" defendant's ability to care for himself.  § 1B1.13(b)(1)(B).  In particular, defendant's current medical conditions include stage three chronic kidney disease, type two diabetes, high cholesterol, hypertension, gout, shortness of breath, and polyarthritis.  ECF 75-1 at 1–2.

27

Samuel has also been diagnosed with "Charcot ankles," for which he has been prescribed a "[b]ottom bunk" and "[s]oft shoes." *Id.* at 17. "Charcot foot is a rare complication of diabetes-related neuropathy." *Charcot Foot*, CLEVELAND CLINIC, https://perma.cc/WC6N-ZPYK (last visited December 8, 2023). "Diabetes-related neuropathy is nerve damage" that "makes it hard (or impossible) to feel pain or notice other signs that something is hurting [the] foot." *Id.* If not treated, "Charcot foot can make the joint in [the] foot collapse and permanently affect [a person's] ability to use [the] foot." *Id.* "In severe cases, this can lead to needing [the] foot amputated or cause life-threatening complications." *Id.*

As noted, defendant became severely ill with COVID-19 in January 2022, and was "diagnosed with acute respiratory failure, hypoxemia, and pneumonia." ECF 75-1 at 15. He also presented with "altered sensorium." *Id.* Fortunately, although "encephalopathy was suspected," a "brain CT [computed tomography] was negative." *Id.*

Nevertheless, defendant remained hospitalized at Robert Wood Johnson Hospital from January 14, 2022, until February 16, 2022. *Id.* at 28. And, since his infection with COVID-19, defendant has been "wheel chair bound," which "he attributes . . . to his difficulty in walking due to exertion SOB [shortness of breath] . . . and pain in joints of lower extremities." *Id.* at 14. A record of a physical examination conducted on October 13, 2022, states that defendant "[p]resented to the clinic in a wheelchair . . . ." *Id.* at 33. According to the record, defendant "had difficulty climbing the examination table" and "difficulty walking independently without support." *Id.*

Additionally, Samuel's records indicate that on August 23, 2022, a neurologist recommended that defendant undergo a "brain MRA and MRI." *Id.* at 23. The neurologist's notes state that defendant "still experiences brain fog and believes [himself] to be cognitively slower than normal." ECF 81-1 at 102. Notably, the neurologist ordered brain imaging tests "to rule out

28

any . . . vascular/intracranial pathology that could be contributing" to defendant's perceived cognitive impairments, shortness of breath, and fatigue. *Id.* at 103. Yet, by February 27, 2023, these tests had not occurred. ECF 75-1 at 19. At that time, a doctor entered an "Administrative Note" asking "the AHSA . . . to expedite his MRA and brain MRI." *Id.* The medical records available to the Court provide no evidence that these tests ever occurred. Nor have counsel advised the Court as to the status of the tests.

As noted, defendant submitted a sworn Declaration describing his illness with COVID-19 and his continuing post-infection symptoms. *See* ECF 72-1 at 7–11. He states, *id.* at 10: "Due to my illness, I lost the ability to walk . . . . Though the hospital admitted me to physical therapy, which was painful, I never regained the use of my legs and now confined to a wheelchair."

In sum, defendant suffers from an array of chronic, serious medical conditions, including stage three chronic kidney disease, type two diabetes, and hypertension. *Id.* at 1–2. He became severely ill with COVID-19 in January 2022, and required hospitalization for over a month after suffering "acute respiratory failure, hypoxemia, and pneumonia." *Id.* at 15. Since his infection, defendant has been prevented from walking without assistance by ongoing breathing difficulty and pain in his lower extremities. *Id.* at 28. Defendant's difficulty breathing, stage three chronic kidney disease, type two diabetes, diabetes-related neuropathy, and his inability to walk without assistance compel the conclusion that he is "suffering from a serious physical or medical condition" or "a serious functional . . . impairment" that "substantially diminishes" defendant's ability to care for himself. § 1B1.13(b)(1)(B). Therefore, I readily conclude that, under § 1B1.13(b)(1)(B) of the Policy Statement, defendant has established an extraordinary and compelling reason for relief.

29

In addition, the medical records available to the Court suggest that "[t]he defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." § 1B1.13(b)(1)(C).  As noted, a neurologist ordered two brain imaging tests on August 23, 2022.  ECF 75-1 at 23.  The purpose of these tests was "to rule out any . . . vascular/intracranial pathology that could be contributing" to defendant's persistent post-infection symptoms.  ECF 81-1 at 103.  However, there is no evidence in the medical records provided to the Court that these tests were ever conducted.

The neurologist's order that defendant undergo brain imaging in relation to defendant's persistent post-infection symptoms provides a basis to conclude that defendant has a medical condition requiring a form of "specialized medical care." § 1B1.13(b)(1)(C).  And, to the Court's knowledge, this "specialized medical care" has "not be[en] provided." *Id.*  Moreover, given defendant's already precarious health status, failure to receive the specialized testing ordered by the neurologist places him "at risk of serious deterioration in health or death." *Id.*  Therefore, an extraordinary and compelling reason for relief also exists under § 1B1.13(b)(1)(C) of the Policy Statement.

## C.

Having determined that Samuel has established an extraordinary and compelling reason to reduce his sentence, I must next consider whether a sentencing reduction would be consistent with the factors enumerated in 18 U.S.C. § 3553(a).  In my view, a reduced sentence of 120 months of imprisonment is "sufficient, but not greater than necessary, to comply with" these sentencing factors.

The FSA "does not constrain the Court to decide between immediate release or no reduction at all, and instead leaves the Court discretion in its evaluation of the appropriate sentence once it finds 'extraordinary and compelling reasons.'"  *United States v. Braxton*, JKB-09-478, 2020 WL 4748536, at *5 (D. Md. Aug. 17, 2020).  Indeed, the statutory text of the First Step Act allows courts to "reduce the term of imprisonment" upon a finding of "extraordinary and compelling reasons."  18 U.S.C. § 3582(c)(1)(A).

Numerous district courts in both this Circuit and others have granted sentence reductions without immediate release. *See, e.g.*, *United States v. Johnson*, RDB-07-0153, 2020 WL 6063733, at *5 (D. Md. Oct. 14, 2020) (reducing sentence from 360 months to 300 months); *Braxton*, 2020 WL 4748536, at *5 (reducing sentence from 246 months to 168 months); *United States v. Marks*, 455 F. Supp. 3d 17, 37–38 (W.D.N.Y. 2020) (reducing sentence from 40 years to 20 years); *United States v. Arey*, Crim. No. 5:05-00029, 461 F.Supp.3d 343, 2020 WL 2464796 (W.D. Va. May 13, 2020) (reducing sentence but denying immediate release); *United States v. Day*, 474 F. Supp. 3d 790 (E.D. Va. 2020) (same); see *also United States v. Zullo*, 976 F.3d 228, 327 (2d Cir. 2020) ("It bears remembering that compassionate release is a misnomer. 18 U.S.C. § 3582(c)(1)(A) in fact speaks of sentence reductions. A district court could, for instance, reduce but not eliminate a defendant's prison sentence . . . .").  Therefore, I may reduce defendant's sentence to 120 months of imprisonment without granting immediate release.

Defendant's "history and characteristics" favor some form of relief.  18 U.S.C. § 3553(a)(1).  For present purposes, the most salient of defendant's "characteristics" is his severely compromised physical condition.  As discussed, *supra*, defendant's health has significantly declined since his term of incarceration began.  After being hospitalized for more than a month with severe COVID-19, defendant has experienced persistent shortness of breath and is now

unable to walk without assistance.  ECF 75-1 at 14, 33.  He remains affected by several serious chronic medical conditions, including stage three kidney disease and type two diabetes.  *See, e.g., id.* at 22.  He has been diagnosed with a form of diabetes-related nerve damage in his ankles, *id.* at 17, which suggests that his diabetes is not well managed.  Although a neurologist recommended in August of 2022 that defendant undergo brain imaging tests, *id.* at 23, to the Court's knowledge, these tests were never completed.  Defendant's poor health and his apparent failure to receive adequate care while incarcerated suggest that he would be better served in a non-carceral setting.

To be sure, defendant's significant criminal history is disturbing.  As noted, before the instant offense, he had nine adult criminal convictions, ECF 39, ¶¶ 27–35, four of which were for possession with intent to distribute heroin or cocaine, *id.* ¶¶ 28, 32–33, 35, and three of which involved firearms.  *Id.* ¶¶ 29, 32, 34.  As I observed in my Memorandum Opinion of November 20, 2020, "drugs and guns are a dangerous combination."  ECF 65 at 16.  Nonetheless, it is significant that the longest sentence Samuel ever received for a previous offense was five years of imprisonment.  ECF 39, ¶ 32.  Of that five-year sentence, he served only about three years.  *Id.* Therefore, the deterrent effect of defendant's current sentence—even when reduced to 120 months—is far greater than that of any sentence defendant has previously served.

It is noteworthy that defendant is now 56 years old.  *See Find an inmate*, *supra*, https://www.bop.gov/inmateloc/.  His age reduces the likelihood of recidivism.  *See United States v. Payton*, 754 F.3d 375, 377 (6th Cir. 2014) ("Recent analysis from the Bureau of Justice Statistics considering the recidivism rates of released prisoners in 30 states (including [Maryland]) from 2005 to 2010 supported the Commission's conclusion, finding decreased recidivism rates as prisoners age.[1]") (citing United States Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, *Recidivism of Prisoners Released in 30 States in 2005: Patterns from 2005 to*

*2010* at 12 (April 2014), https://perma.cc/ZE9K-QD9U)); *see also United States v. Howard*, 773 F.3d 519, 533 (4th Cir. 2014) ("[S]tudies demonstrate that the risk of recidivism is inversely related to an inmate's age.").  Indeed, those aged 40 years or older had the lowest recidivism rates. See *Recidivism of Prisoners*, at 12.

Moreover, several district courts in the Fourth Circuit have considered a defendant's current age as it relates to recidivism when balancing the § 3553(a) factors in a motion for compassionate release. *See, e.g., United States v. Hill*, 2023 WL 35211, at *9, 649 F.Supp.3d 200 (E.D. Va. Jan. 4, 2023) (age 59); *United States v. Mills*, DCN-97-815, DCN-98-786, 2022 WL 206074, at *6 (D.S.C. Jan. 24, 2022) (age 57); *United States v. Epstein*, JKB-17-453, 2020 WL 4339325, at *2 (D. Md. July 28, 2020) (age 60).

I am mindful that persons with physical impairments can commit crimes.  But, I believe that defendant's age, confinement to a wheelchair, and other chronic medical conditions make it less likely that he will reoffend.

Moreover, defendant's plan for release weighs in his favor.  According to the plan provided to the Court, defendant intends to live with his aunt, who will assist him in obtaining appropriate medical care.  ECF 75 at 6.

I am also satisfied that a reduced sentence of 120 months' imprisonment adequately "reflect[s] the seriousness of the offense . . . promote[s] respect for the law, and . . . provide[s] just punishment for the offense."  18 U.S.C. 3553(a)(2)(A).  The punitive effect of a sentence served during the pandemic is certainly greater than that of a sentence served under normal conditions. *See United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("[T]he actual severity of the sentence as a result of the COVID-19 outbreak exceeds what the Court anticipated at the time of sentencing.").  This is especially so when, as here, a defendant serving a

term of imprisonment becomes seriously ill with COVID-19, suffers "acute respiratory failure," requires a 34-day hospitalization, and experiences persistent breathing problems that confine him to a wheelchair.  ECF 75 at 15.  Under these circumstances, I am satisfied that the punitive effect of a sentence of 120 months of imprisonment adequately reflects the seriousness of Samuel's offense, promotes respect for the law, and provides just punishment for the offense.  *See* 18 U.S.C. § 3553(a)(2)(A).

The fact that Samuel has committed three infractions while incarcerated does not disturb my conclusion.  As noted, Samuel received infractions for "smoking in an unauthorized area" and "disruptive conduct," both related to his smoking a cigarette in a prison bathroom, and for "being absent from assignment," after "he overslept and missed" a medical appointment.  ECF 81-2. Every violation of prison rules is serious.  Nonetheless, in my view, these infractions are sufficiently unrelated to defendant's past criminal conduct that they do not call into question defendant's readiness to conform his conduct to the law upon release.

### V.  Conclusion

For the foregoing reasons, I shall grant the Motion in part and reduce defendant's sentence to 120 months of imprisonment, with credit dating to February 2, 2016.  All terms and conditions of the supervised release imposed by the Judgment of March 16, 2017 (ECF 43) shall remain in effect.

A revised Judgment shall issue.

An Order follows, consistent with this Memorandum Opinion.


Date:  December 14, 2023                                          /s/
                                                          Ellen Lipton Hollander
                                                          United States District Judge